OPINION
{¶ 1} Plaintiff-appellant, Gregory B. Morgan, appeals from judgments of the Franklin County Court of Common Pleas. Defendant-appellee, Essam Mikhail, cross appeals from the same judgments. For the following reasons, we reverse the judgment purporting to reflect the parties' resolution of Morgan's contempt motion, and we affirm in part and reverse in part the judgment finding Mikhail liable and awarding Morgan damages. *Page 2 
 {¶ 2} Morgan and Mikhail first met in the fall of 1978 when both attended Ohio University. Although the parties did not form a close friendship, they remained cordial and spoke periodically over the next two decades. Sometime during the winter of 1999, Morgan and Mikhail ran into each other at a Grandview coffee shop. Mikhail told Morgan that he was working as an investment advisor, and he asked if Morgan had a financial plan for his retirement. Even though Morgan replied that he did not have any money, Mikhail expressed interest in helping Morgan build a retirement portfolio. He told Morgan that he handled the financial affairs of a number of wealthy people, including friends of his father, who was a respected professor of finance at Ohio University. Given his lack of money, Morgan declined Mikhail's financial services.
 {¶ 3} Within months of this conversation, Morgan's grandmother died and bequeathed $50,000 to Morgan. Sometime thereafter, Morgan and Mikhail again met by chance at a coffee shop. Mikhail repeated his offer to manage Morgan's money, claiming that he was a very savvy investor. Morgan mentioned his inheritance, and Mikhail told Morgan that he could invest that money to "get [Morgan] setup for retirement." (Tr. at 69.) Mikhail reiterated his success at developing and managing investment portfolios for his clients. Although Morgan did not succumb to Mikhail's sales pitch, he gave Mikhail his telephone number.
 {¶ 4} After a number of telephone calls in which Mikhail tried to persuade Morgan to hire him as his investment advisor, Mikhail showed up at Morgan's house with a proposed investment plan. Mikhail guaranteed Morgan a 20 percent return on his investment and told Morgan that he never lost money for his clients. Mikhail said that, in *Page 3 
return for his services, he would charge an annual commission of a certain percentage of the value of Morgan's portfolio.
 {¶ 5} Morgan again refused to allow Mikhail to invest his money, but the two continued to talk. In one of their conversations, Morgan asked Mikhail about his own investment portfolio. Mikhail told Morgan that his portfolio contained $750,000 worth of investments. In another conversation, Morgan asked if Mikhail was a licensed stockbroker. Mikhail said that he was.
 {¶ 6} Then, one Saturday morning, Mikhail telephoned Morgan and told him that he had a "really good deal" for Morgan, but they had "to act on it now." (Tr. at 82.) Mikhail told Morgan that if he deposited $88 in Mikhail's bank account, Mikhail would purchase one share of stock for Morgan. Mikhail said that once Morgan owned that one share of stock, he could then purchase additional shares without paying a commission. Morgan agreed to purchase the share, and he deposited the $88.
 {¶ 7} Shortly after this incident, Morgan consented to the implementation of the investment plan that Mikhail had devised. In early May 2000, Morgan gave Mikhail a check for $2,500 so that Mikhail could invest the money in accordance with the investment plan.
 {¶ 8} Mikhail told Morgan that he needed to open a brokerage account so that Mikhail could purchase securities for Morgan. Mikhail and Morgan met at the Dublin office of Scottsdale Securities, Inc. ("Scottsdale"), a brokerage firm. Morgan expressed interest in opening an account, and a Scottsdale employee handed him a form entitled "Trading Authorization Limited to Purchase and Sales of Securities." The form allowed an account owner to authorize an agent to buy and sell securities on the account owner's *Page 4 
behalf. Morgan signed the form as the account owner and handed it to Mikhail, who completed it. Mikhail signed the form as the authorized agent. In response to the portion of the form requesting the agent's personal information, Mikhail represented that by occupation he was an "economist," and he also indicated that he was not a registered investment advisor. Morgan, however, did not watch Mikhail as he wrote down the relevant information, and Morgan did not see the completed form.
 {¶ 9} Upon receipt of the form, the manager of the Scottsdale office told Morgan that she would open an account for him, but "she did not want to have anything to do with Mr. Mikhail." (Tr. at 89.) Morgan and Mikhail left the office, and Morgan asked Mikhail why the manager would not work with him. Mikhail said that he had a dispute with the manager over a commission that Scottsdale charged one of Mikhail's clients. Mikhail also told Morgan that he would open an account for Morgan at a California brokerage firm.
 {¶ 10} Approximately one week after Morgan gave Mikhail the $2,500 check, Mikhail called Morgan and asked to meet with him at the Grandview Kroger. Mikhail told Morgan to bring his checkbook. Morgan agreed and requested that Mikhail provide him with a receipt to memorialize the transfer of the money. Morgan and Mikhail met in the Kroger parking lot, and Morgan handed Mikhail a check for $25,000. Mikhail gave Morgan a handwritten, signed document dated May 9, 2000 that read:
 To Whom it May Concern
 I Essam Mikhail Do Hereby Borrow The Sum of $27,500 Twenty Seven Thousand Five Hundred Dollars from Mr. Greg Morgan. It Will Be Paid Back in Stock @ My Cost.
Morgan accepted this document as his receipt for the $2,500 check and the $25,000 check. *Page 5 
 {¶ 11} After this meeting, Mikhail told Morgan that Morgan had made $1,400 in one stock and $1,600 in another. Morgan then gave Mikhail another $10,000 to invest in accordance with the investment plan.
 {¶ 12} In early June 2000, Mikhail met with Morgan at Morgan's home. During this visit, Mikhail told Morgan that the value of his account had grown by 20 percent, with the value of one particular security increasing by $6,000. Based upon what Mikhail represented, Morgan calculated that he had made $10,000. Mikhail said "that's true" and told Morgan that Morgan owed him a commission of $335. (Tr. at 100.) Morgan wrote Mikhail a check for the requested amount.
 {¶ 13} Morgan then asked Mikhail how to handle the payment of taxes on his profits. Mikhail told Morgan that he would pay the taxes, and Morgan would reimburse him. When Morgan questioned that arrangement, Mikhail told Morgan that he had used his own brokerage account to purchase securities with Morgan's money. Consequently, Mikhail, not Morgan, owned the securities purchased with Morgan's money. Morgan became very upset and demanded that Mikhail put the securities in Morgan's name. Mikhail agreed to do as Morgan asked.
 {¶ 14} Throughout June 2000, Mikhail assured Morgan that he was working on transferring the securities into Morgan's name. Morgan, who was beginning to distrust Mikhail, demanded a full accounting of the securities Mikhail had purchased with Morgan's money. On July 1, 2000, the parties met at the Grandview Kroger. Mikhail gave Morgan a one-page printout listing equity and option assets. Confused and dissatisfied, Morgan demanded that Mikhail return his money. Mikhail responded that he needed a couple days to liquidate the securities. *Page 6 
 {¶ 15} After the July 1, 2000 meeting, Mikhail stopped returning Morgan's telephone calls. On July 3, 2000, Morgan received a faxed letter from Mikhail in which Mikhail presented Morgan with three options: (1) Morgan could "take" his portfolio; (2) Mikhail would liquidate Morgan's portfolio, with Morgan assuming any loss in value; (3) Mikhail would give Morgan a promissory note for an undisclosed amount. Mikhail threatened to report Morgan to the Internal Revenue Service if Morgan did "something stupid."
 {¶ 16} Over the next month, Mikhail sent Morgan a series of letters urging him to accept a transfer of securities or a promissory note in lieu of a monetary reimbursement. During this time period, Morgan also began receiving back-dated "Stock Power" forms from Mikhail in which Mikhail transferred shares of stock to Morgan. Concerned by Mikhail's unauthorized use of his social security number to accomplish these transfers, Morgan put a "global stop" on his social security number.
 {¶ 17} In the ensuing months, Morgan repeatedly attempted to contact Mikhail, to no avail. Eventually, Morgan sought help from the Ohio Department of Commerce, Division of Securities. Additionally, on December 11, 2000, Morgan filed suit against Mikhail and alleged claims for fraud, breach of fiduciary duty, negligence, conversion, intentional infliction of emotional distress, and violations of Ohio securities law. Morgan also named as a defendant J.B. Oxford Company ("J.B. Oxford"), a brokerage firm with which Mikhail had an account, and he sought injunctive relief against both Mikhail and J.B. Oxford.
 {¶ 18} The trial court granted Morgan a temporary restraining order that required J.B. Oxford to freeze Mikhail's account, liquidate the securities held in the account, and *Page 7 
deliver the liquidated funds to the court clerk. The temporary restraining order required Mikhail to provide an accounting of all transactions he had entered into with Morgan's money. Additionally, if J.B. Oxford transmitted less than $37,923 to the clerk, then the temporary restraining order mandated that Mikhail remit to the clerk the difference between $37,932 and the amount transmitted by J.B. Oxford.
 {¶ 19} Although J.B. Oxford complied with the temporary restraining order, Mikhail did not.[1] Thus, Morgan filed a motion for contempt against Mikhail.
 {¶ 20} In the meantime, the trial court held a hearing and then issued a preliminary injunction ordering Mikhail to produce any records that showed how he used Morgan's money by January 15, 2001 (later extended to January 17, 2001). The trial court also prohibited Mikhail from selling, transferring, giving away, or otherwise transacting business with Morgan's money or assets purchased with Morgan's money. In the same order, the trial court directed the clerk to release the funds received from J.B. Oxford to Morgan. The court docket reflects that the clerk disbursed a total of $6,628.44 to Morgan.
 {¶ 21} While Mikhail produced some records on January 17, 2001, the records were incomplete and disorganized. Accordingly, on January 19, 2001, the trial court issued a permanent injunction giving Mikhail until February 8, 2001 to provide all the relevant records.[2] Also, the trial court ordered Mikhail to refrain from ever disclosing or using Morgan's social security number.
 {¶ 22} On January 25, 2001, the trial court issued a judgment entry of contempt against Mikhail for his failure to produce the records as required by the temporary *Page 8 
restraining order and the preliminary injunction. The trial court awarded Morgan attorney fees in the amount of $3,500 plus ten percent interest per annum.
 {¶ 23} In the midst of this civil proceeding, Mikhail was indicted for being an unlicensed investment advisor, engaging in fraud as an investment advisor, mishandling funds as an investment advisor, theft, forgery, and intimidation of a victim or witness. Pursuant to Mikhail's motion, on August 27, 2001, the trial court stayed this case until criminal proceedings against Mikhail concluded.
 {¶ 24} Ultimately, Mikhail pled guilty to two counts: (1) being an unlicensed investment advisor, a third degree felony, and (2) mishandling funds as an investment advisor, a fourth degree felony. The trial court sentenced Mikhail to four years on the first count and 12 months on the second, to be served concurrently. Also, the trial court imposed restitution in the amount of $29,123, plus $662.50 for counseling fees Morgan incurred. State v. Mikhail, Franklin App. No. 02AP-545, 2002-Ohio-6842, at ¶ 3, 5 (affirming the judgment sentencing Mikhail for his crimes).
 {¶ 25} Once Mikhail was sentenced, the trial court reactivated this case. On January 28, 2004, the trial court issued a "Sua Sponte Order of Dismissal" in which the court found that Mikhail's conviction was dispositive of Morgan's claim for violations of Ohio securities law. Therefore, the trial court granted judgment to Morgan under that claim and awarded Morgan $29,123 plus $4,650 for attorney fees. The trial court then dismissed the remainder of Morgan's claims.
 {¶ 26} Morgan appealed the January 28, 2004 judgment to this court, arguing that the trial court erred in dismissing his claims sua sponte. We agreed with Morgan, and we held that the trial court erred in entering a judgment of dismissal in the absence of a *Page 9 
request for affirmative relief. Morgan v. Mikhail, Franklin App. No. 04AP-195, 2004-Ohio-5792, at ¶ 9. Consequently, we reversed the January 28, 2004 judgment. Id. at ¶ 26.
 {¶ 27} Upon remand to the trial court, Morgan filed a jury demand. In pre-trial proceedings, Morgan contended that this demand entitled him to a jury trial. The trial court disagreed and a trial before the bench commenced. Morgan was the only witness to testify at the trial, and he presented the facts set forth above.
 {¶ 28} On January 25, 2007, the trial court issued its findings of fact and conclusions of law. The trial court found that Morgan proved his claims for fraud, breach of fiduciary duty, and conversion, and it awarded him $27,705.23 in compensatory damages. The trial court, however, also found that Mikhail was not liable for negligence, intentional infliction of emotional distress, or violations of Ohio securities law. Moreover, the trial court did not award Morgan any punitive damages or attorney fees.
 {¶ 29} Morgan, meanwhile, began pursuing Mikhail for contempt of court. On January 2, 2007, Morgan filed "Plaintiff's Motion for Order to Show Cause, Request for Sanctions Against Defendant and Defense Counsel Douglas J. Hart, and Request for Incarceration of Defendant Essam Mikhail for Failure to Pay a Previous Judgment Order in Contempt." In that motion, Morgan asserted that the January 19, 2001 permanent injunction required Mikhail to return to Morgan any monies he had expropriated.[3] Based upon Mikhail's February 2001 discovery responses, Morgan claimed that Mikhail possessed $1,648 in funds and/or securities that he had yet to disburse to Morgan. Thus, Morgan sought a judgment of contempt against Mikhail for his failure to transfer those *Page 10 
funds and/or securities as required by the permanent injunction. Additionally, Morgan asked the trial court to incarcerate Mikhail for his failure to pay the $3,500 awarded to Morgan in the January 25, 2001 judgment of contempt.
 {¶ 30} The trial court referred the matter to a magistrate for a show cause hearing on Morgan's motion. According to the magistrate's report, the parties appeared for the scheduled hearing and negotiated a resolution of the contempt motion. The report also stated that the parties would submit to the trial court an agreed entry reflecting their resolution.
 {¶ 31} Because the parties could not agree upon the terms of their resolution, they each submitted proposed judgment entries. Mikhail proposed that the trial court order him to transfer the securities held in his America Online brokerage account to Morgan. The proposed judgment entry also mandated that the $3,500 unpaid contempt judgment would be reduced by the value of the securities. While Morgan did not dispute that the parties agreed to the transfer of the securities, his proposed judgment entry required that the value of the securities be applied to reduce either the amount Mikhail had to pay in restitution or the amount of any judgment awarded in the instant case. In subsequent filings, each party accused the other of misrepresenting the terms of the agreed resolution.
 {¶ 32} On January 8, 2008, the trial court adopted Mikhail's proposed judgment entry. On that same day, the trial court also entered judgment consistent with the findings of fact and conclusions of law.
 {¶ 33} Morgan now appeals from the January 8, 2008 judgments and assigns the following errors: *Page 11 
 [1.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT RULED THAT APPELLANT WAS NOT ENTITLED TO A JURY BECAUSE HE FILED HIS JURY DEMAND LATE.
 [2.] THE TRIAL COURT ERRED WHEN IT RULED APPELLEE'S INTENTIONAL AND DECEPTIVE BEHAVIOR AND KNOWLEDGE OF POSSIBLE HARM WAS NOT INDICATIVE OF MALICE AND DID NOT AWARD APPELLANT PUNITIVE DAMAGES BASED ON THIS ERRANT RULING.
 [3.] THE TRIAL COURT ERRED WHEN IT FAILED TO AWARD PUNITIVE DAMAGES AS A CONSEQUENCE OF ITS FAILURE TO ADMIT ALL RELEVANT EVIDENCE OF DEFENDANT'S ACTS OF REVENGE WITH REGARD TO MALICE.
 [4.] THE TRIAL COURT ERRED WHEN IT STATED IN OPEN COURT THAT APPELLANT IS ENTITLED TO RECOUP HIS EXPENSES LITIGATING THIS CASE INCLUDING ATTORNEY FEES BUT THEN FAILED TO AWARD HIM EXPENSES AND FEES OR CONDUCT A HEARING ON THE MATTER.
 [5.] THE TRIAL COURT ERRED WHEN IT FOUND THAT APPELLANT HAD ONLY GIVEN APPELLEE $37,500.00 WHEN ACTUALLY THE TOTAL WAS $37,923.00. AND THAT APPELLANT HAS RECOVERED $9,794.77 WHEN THE TOTAL IS ACTUALLY $8,800.00 LEAVING A BALANCE OWED OF $29,123.00 NOT $27,705.23. THE COURT FURTHER ERRED WHEN IT TOLD APPELLANT THAT HE HAD SUBSTANTIATED HIS CLAIM OF $29,123.00 FULLY AND THEN FAILED TO AWARD THAT AMOUNT.
 [6.] THE TRIAL COURT ERRED WHEN IT FOUND THAT APPELLANT BROKE A CONTRACT BETWEEN THE PARTIES AND AT THE SAME TIME RULED THAT APPELLEE HAD ENGAGED IN FRAUD SINCE THE PRESENCE OF FRAUD EFFECTIVELY NULLIFIED ANY VERBAL OR WRITTEN CONTRACT THE PARTIES HAD AGREED TO.
 [7.] THE TRIAL COURT ERRED WHEN IT FOUND THAT APPELLEE HAD INVESTED ALL OF PLAINTIFF'S $37,923.00 IN STOCKS WHEN ACTUALLY ONLY *Page 12 
$20,000.00 HAD BEEN INVESTED AND $18,000 HAD BEEN DEPOSITED AS CASH IN APPELLEE'S BANK ACCOUNTS AND USED FOR HIS OWN PURPOSES.
 [8] THE TRIAL COURT ERRED WHEN IT FOUND THAT APPELLANT RATHER THAN APPELLEE HAD LIED ON THE TRADING AUTHORIZATION FORM BY WRITING "OUT OF TOWN TRAVEL" AS THE REASON FOR REQUESTING THE AUTHORIZATION THUS CALLING APPELLANT'S CREDIBILITY INTO QUESTION.
 [9] THE TRIAL COURT ERRED WHEN IT ADOPTED APPELLEE'S PROPOSED JUDGMENT ENTRY WHICH WAS CONTRARY TO THE AGREED ENTRY THE PARTIES AND THE COURT HAD SIGNED AND FILED ALLOWING APPELLEE TO APPLY PROCEEDS FROM THE LIQUIDATED STOCKS TO HIS SIX-YEAR-OLD CONTEMPT AWARD RATHER THAN APPLYING THEM TO ANY AWARD ULTIMATELY AWARDED IN THIS CASE.
 {¶ 34} Mikhail cross appeals from the January 8, 2008 judgments and assigns the following errors:
 [1.] The Trial Court Erred As A Matter of Law By Awarding Damages in Tort for Purely Economic Losses in Violation of the Economic Loss Rule Established by the Corporex Development case.
 [2.] The Trial Court Erred As A Matter of Law and Abused its Discretion by Concluding That Appellee Engaged in Fraud.
 [3.] The Trial Court Erred As A Matter of Law and Abused its Discretion by Concluding That Appellee Breached a Fiduciary Duty Owed to Plaintiff.
 [4.] The Trial Court Erred As A Matter of Law and Abused its Discretion by Concluding That Appellee Converted Appellant's Personal Property.
 [5.] The Trial Court Erred As A Matter of Law and Abused its Discretion by Adopting an Order on January 8, 2008 Implementing the Parties' Agreement in Settlement of Appellant's Second Contempt Motion Because the Trial Court's Order requires the Performance of Certain Action by *Page 13 
Appellee by June 30, 2007, which action is impossible due to the passage of time.
 [6.] The Trial Court Abused its Discretion by Finding That Appellee Misrepresented Appellee's Occupation as an Economist Because the Finding is Devoid of Support in the Record Below.
 {¶ 35} By Morgan's first assignment of error, he argues that the trial court erred in refusing to empanel a jury for trial. We disagree.
 {¶ 36} Trial by jury is a substantive, fundamental right protected by the Seventh Amendment to the United States Constitution and Section 5, Article I of the Ohio Constitution. Soler v. Evans, St. Clair Kelsey (2002), 94 Ohio St.3d 432, 437. However, in order to invoke the right to a jury trial, a party must take affirmative action. Id. Pursuant to Civ. R. 38(B), "[a]ny party may demand a trial by jury on any issue triable of right by a jury by serving upon the other parties a demand therefore at any time after the commencement of the action and not later than fourteen days after the service of the last pleading directed to such issue." Failure to timely serve and file a demand for a jury trial constitutes a waiver of the right to a trial by jury. Civ. R. 38(D). See, also, Wray v. Allied Indus. Dev. Corp. (2000),138 Ohio App.3d 362, 365 ("Generally, where there is a right to trial by jury, a party must file a timely demand for a jury or that party waives its right to have the case heard by a jury."); Lucas, Prendergast, Albright,Gibson, Newman v. Zschach (Sept. 12, 1996), Franklin App. No. 95APE12-1663 ("`The failure of a party to timely serve his demand for a jury trial as required by the Civil Rules constitutes a waiver by him of a trial by jury.'").
 {¶ 37} In the case at bar, Morgan filed his jury demand on January 5, 2005, soon after this court remanded this case to the trial court. As Morgan's jury demand was filed *Page 14 
over a year after the last pleading in the case, it was untimely.[4] 2 Klein Darling, Civil Practice (2 Ed. 2004) 192, Section 38:21 ("[A] demand made more than fourteen days after service of the last pleading in the action is untimely under Civ. R. 38(B) whether or not that last pleading is directed to the issue in question."). Morgan, however, maintains that he satisfied the time requirements of Civ. R. 38(B) because the remand commenced a new action, thus giving him another opportunity to file a jury demand. We find this argument unavailing. A civil action commences with the filing of a complaint, not the reinstitution of a case upon remand. Civ. R. 3(A) ("A civil action is commenced by filing a complaint with the court, if service is obtained within one year from such filing * * *.). Consequently, a remand to the trial court does not reinitiate the timetable for filing a jury demand. Accordingly, we conclude that Morgan waived his right to a jury trial, and we overrule his first assignment of error.
 {¶ 38} By Morgan's second assignment of error, he argues that the trial court erred in denying him punitive damages. We disagree.
 {¶ 39} The decision to award or deny a plaintiff punitive damages is within the trial court's discretion and, absent an abuse of that discretion, an appellate court must uphold the trial court's ruling.Kemp v. Kemp, 161 Ohio App.3d 671, 2005-Ohio-3120, at ¶ 73; DeHoff v.Veterinary Hosp. Operations of Central Ohio, Inc., Franklin App. No. 02AP-454, 2003-Ohio-3334, at ¶ 165. Pursuant to the version of R.C. 2315.21 applicable here, a plaintiff cannot recover punitive damages unless he demonstrates "malice, aggravated or egregious fraud, oppression or insult * * *." Former R.C. 2315.21(B)(1) (enacted by Am. Sub. H.B. No. 1, 1987 Laws of Ohio 5-812). A bare case of fraud does not warrant *Page 15 
the assessment of punitive damages. White Oak Communities, Inc. v.Russell (Nov. 9, 1999), Franklin App. No. 98AP-1563. Rather, a plaintiff is only entitled to punitive damages on the basis of fraud if that fraud is "malicious, deliberate, gross, or wanton." Logsdon v. Graham FordCo. (1978), 54 Ohio St.2d 336, 339. Malice requires that "the defendant possessed either (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Cabe v. Lunich (1994),70 Ohio St.3d 598, 601.
 {¶ 40} In the case at bar, the trial court found that Mikhail defrauded Morgan, but it did not find that Mikhail's behavior was so malicious or egregious as to justify an award of punitive damages. While this court may have interpreted the evidence differently, we are constrained by our standard of review to merely determine whether the trial court's ruling constituted an abuse of discretion. Applying this standard, we conclude that the trial court did not err in denying Morgan punitive damages, and thus, we overrule Morgan's second assignment of error.
 {¶ 41} By Morgan's third assignment of error, he argues that the trial court erred in excluding two documents that he offered to prove that Mikhail acted with a spirit of revenge — a state of mind indicative of the malice necessary for an award of punitive damages. We disagree.
 {¶ 42} In the case at bar, the trial court refused to admit a copy of a pornographic magazine that Mikhail mailed to Morgan and a copy of the book Investing for Dummies, which Mikhail gifted to Morgan. Morgan claimed that the magazine and book showed *Page 16 
Mikhail's pattern of threats and intimidation. The trial court found the magazine and book irrelevant and inadmissible.
 {¶ 43} Generally, the admission of evidence is within the discretion of the trial court, and an appellate court will only reverse the trial court's ruling upon a showing of abuse of discretion. State ex rel.Elsass v. Shelby Cty. Bd. of Commrs. (2001), 92 Ohio St.3d 529, 533. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401.
 {¶ 44} Like the trial court, we find that neither the magazine nor the book constitute a threat. Moreover, we find that the magazine and book, in and of themselves, do not evince whether revenge motivated Mikhail. While the trial court could possibly infer Mikhail's state of mind from the context in which Morgan received the magazine and book, the trial court permitted Morgan to testify as to that context. Thus, to the extent that Morgan sought to adduce evidence that Mikhail sent him the magazine and book out of revenge, he did so without needing to introduce the actual items. Accordingly, we conclude that the trial court did not abuse its discretion in excluding the magazine and book, and we overrule Morgan's third assignment of error.
 {¶ 45} By Morgan's fourth assignment of error, he argues that the trial court erred in failing to award him attorney fees and litigation expenses. We disagree.
 {¶ 46} Morgan claims that the trial court awarded him his attorney fees and litigation expenses in the following colloquy:
 THE COURT: I am not able to award damages based on projected future expenses unless you can identify them with the sufficient degree of particularity to ensure the fact that those expenses will actually be incurred. *Page 17 
 MR. MORGAN: Okay, judge.
 THE COURT: I can compensate you for documented expenses incurred by you. I don't have a copy of a statement about your attorney's fees.
 MR. MORGAN: I have cancelled checks.
 THE COURT: An itemization of legal fees and court costs, filing costs, which were incurred. I don't have an itemization of counseling expenses that you have incurred, those types of items that you mentioned. Clearly, the $29,123 that you claim, you have substantiated that, I believe, sufficiently. But the other things that you have mentioned, without documentation, would not be compensable.
(Tr. at 144-145.)
 {¶ 47} First, we do not interpret the foregoing as an award of attorney fees and litigation expenses. Rather, the trial court merely expressed that it had the ability to award Morgan his fees and expenses if Morgan provided the court with documentation to prove those fees and expenses. Second, a court speaks only through its journal entries, not through mere oral pronouncements. Schenley v. Kauth (1953),160 Ohio St. 109, paragraph one of the syllabus. See, also, State ex rel. Marshall v.Glavas, 98 Ohio St.3d 297, 2003-Ohio-857, at ¶ 5 ("[A]ny oral pronouncements by [the trial court] were subject to revision before journalization."). Thus, even if the trial court had orally awarded Morgan his attorney fees and litigation expenses, that award would have no legal force and effect because the trial court did not include it in a journal entry. In re Guardianship of Hollins, 114 Ohio St.3d 434,2007-Ohio-4555, at ¶ 30. Accordingly, we overrule Morgan's fourth assignment of error.
 {¶ 48} By his fifth assignment of error, Morgan argues that the trial court erred in calculating the amount of his compensatory damages. We agree. *Page 18 
 {¶ 49} In its findings of fact and conclusions of law, the trial court stated that, "[p]laintiff has received a total of $9,794.77 from various sources as partial restitution." (Findings of Fact and Conclusions of Law, at ¶ 64.) The trial court then found that, "as a direct and proximate result of [defendant's conduct [p]laintiff suffered damages in the amount of $37,500, and has recouped from [defendant $9,794.77 resulting in a compensable net loss of $27,705.23." (Findings of Fact and Conclusions of Law, at ¶ 65.) Based upon this calculation, the trial court awarded Morgan compensatory damages of $27,705.23.
 {¶ 50} An appellate court "will not disturb a decision of the trial court as to a determination of damages absent an abuse of discretion."Roberts v. United States Fid. Guar. Co. (1996), 75 Ohio St.3d 630,634. In the case at bar, Morgan repeatedly testified that his damages amounted to $37,923. This amount includes: (1) $88 deposited into Mikhail's bank account for the purchase of one share of stock, (2) a check for $2,500 to fund Morgan's investment portfolio, (3) a check for $25,000 to fund Morgan's investment portfolio, (4) a check for $10,000 to fund Morgan's investment portfolio, and (5) a check for $335 for Mikhail's commission. While we find it curious that the trial court apparently did not find the $88 deposit or the $335 commission constituted damages, we do not find that the trial court abused its discretion in excluding either amount. The trial court could have ultimately determined that Morgan did not provide sufficient evidence to prove those two elements of his damage calculation.
 {¶ 51} However, we find that the trial court abused its discretion in ruling that Morgan recouped $9,794.77. Quite simply, the trial record contains no evidence to support this figure. Morgan testified as to receiving money from J.B. Oxford through *Page 19 
disbursements from the court clerk, and he stated that he realized additional monies through the sale of the stock that Mikhail had transferred to him in the summer of 2000. Morgan, however, never stated the exact amount he recouped. Instead of providing the trial court with a calculation, Morgan merely stated that, minus the amounts recouped, he lost a total of $29,123. Mikhail's attorney admitted that $29,123 was "the net figure." (Tr. at 241.)
 {¶ 52} Given the lack of evidence supporting the trial court's computation of the "compensable net loss," we find that the trial court erred in awarding Morgan $27,705.23 in compensatory damages. Accordingly, we sustain Morgan's fifth assignment of error.
 {¶ 53} By Morgan's sixth assignment of error, he argues that the trial court erred in finding that the May 9, 2000 document constituted a valid, enforceable contract. As we will discuss in addressing Mikhail's first assignment of error, we agree that the May 9, 2000 document does not include all the elements necessary for a valid contract. However, "existence of error does not require a disturbance of the judgment unless the error is materially prejudicial to the complaining party."Fada v. Information Systems Networks Corp. (1994), 98 Ohio App.3d 785,792. When avoidance of the error would not change the outcome of the proceedings, the error is not prejudicial. Id.
 {¶ 54} Here, if the trial court had avoided the error by determining that the May 9, 2000 document was not a contract, its judgment would be no different. In other words, the trial court's erroneous determination did not influence its finding of liability or the amount of damages awarded to Morgan. Thus, the trial court's error did not materially prejudice Morgan, and we overrule Morgan's sixth assignment of error. *Page 20 
 {¶ 55} By Morgan's seventh assignment of error, he argues that the trial court erred in finding that Mikhail invested all of Morgan's money in stocks, when Mikhail had only invested $20,000 in stock. Our review of the trial court's findings of facts and conclusions of law reveals that the trial court never made the finding that Morgan now disputes. Accordingly, we overrule Morgan's seventh assignment of error.
 {¶ 56} By Morgan's eighth assignment of error, he argues that the trial court erred in finding that he — and not Mikhail — wrote "OUT OF TOWN/TRAVEL" on the Scottsdale form on the blank next to "Reason for Trading Authorization." Again, the trial court did not make the disputed finding. In its findings of facts and conclusions of law, the trial court stated, "[o]n [plaintiff's Exhibit III, `Out of town/TRAVEL' was written in as the reason for the issuance of the Trading Authorization form." (Findings of Fact and Conclusions of Law, at ¶ 23.) Thus, the trial court did not specify who wrote the statement at issue. Moreover, in stating, "[p]laintiff admitted that `Out of town/TRAVEL' was a fabrication," the trial court did not attribute the disputed statement to Morgan. (Findings of Fact and Conclusions of Law, at ¶ 24.) Rather, the trial court merely credited Morgan's testimony that Mikhail lied on the form. Accordingly, we overrule Morgan's eighth assignment of error.
 {¶ 57} By Morgan's ninth assignment of error, he argues that the trial court erred in ruling that Mikhail's proposed judgment entry embodied the terms of the agreement the parties reached to resolve Morgan's motion for contempt. Additionally, Morgan argues that the trial court erred in adopting Mikhail's proposed judgment entry and in rejecting his proposed judgment entry. We agree with Morgan's arguments. *Page 21 
 {¶ 58} A trial court may not enforce a purported settlement agreement when the parties dispute the substance of that agreement. Rulli v. FanCo. (1997), 79 Ohio St.3d 374, 376. To force an agreement upon the parties "would be to deny the parties' right to control the litigation, and to implicitly adopt (or explicitly * * *) the interpretation of one party, rather than enter judgment based upon a mutual agreement." Id. at 377. Consequently, where the parties dispute the terms of a settlement agreement, a trial court must conduct an evidentiary hearing prior to entering judgment. Id.
 {¶ 59} In the case at bar, the parties dispute which proposed judgment entry accurately summarized the terms of their resolution of Morgan's contempt motion. Specifically, a conflict exists over which judgment award should be reduced by the value of the securities held in Mikhail's America Online brokerage account. Morgan argues that the parties agreed to reduce the restitution or the damages award, while Mikhail asserts that they agreed to reduce the $3,500 contempt judgment. Without holding a hearing, the trial court chose to adopt Mikhail's version of the parties' settlement agreement. Pursuant to Rulli, this unilateral decision amounted to error.
 {¶ 60} Moreover, we cannot agree with the trial court's reasoning behind its choice to enter judgment as Mikhail proposed. The trial court held that because the $3,500 contempt judgment was the cause of the contempt hearing, the value of the securities should be applied to that judgment. Although Morgan's contempt motion mentioned Mikhail's failure to pay the $3,500 judgment, it largely focused upon Mikhail's alleged failure to comply with the permanent injunction. Morgan claimed that, pursuant to the terms of the permanent injunction, he was entitled to securities Mikhail still had in his possession. Thus, an alleged violation of the permanent injunction — not the $3,500 *Page 22 
contempt judgment — was the major impetus behind the contempt motion and hearing. Accordingly, because the trial court lacked any basis on which to adopt Mikhail's proposed judgment entry over Morgan's, we sustain Morgan's ninth assignment of error.
 {¶ 61} We now turn to Mikhail's cross appeal. By his first assignment of error, Mikhail argues that the economic-loss rule prohibits Morgan from recovering in tort. We disagree.
 {¶ 62} "The economic-loss rule generally prevents recovery in tort of damages for purely economic loss." Corporex Dev. Constr. Mgt., Inc. v.Schook, Inc. 106 Ohio St.3d 412, 2005-Ohio-5409, at ¶ 6. This rule arose out of product liability law, where courts applied it to limit the type of damages that a plaintiff could recover in a negligence action against a manufacturer. Courts reasoned that a breach of the duty to exercise reasonable care protected the consumer from physical injury, but it did not protect the consumer's economic expectations. Chemtrol Adhesives,Inc. v. American Manufacturers Mut. Ins. Co. (1989), 42 Ohio St.3d 40,45. A manufacturer could only be held liable for purely economic losses if it agreed that the product was designed to meet the consumer's demands, and the product failed to do so. Id. at 47, fn. 3. Thus, while negligence law required a manufacturer to compensate a consumer for personal and property injury, only breach of a contractual duty would render the manufacturer liable for the consumer's economic losses. Id. at 45.
 {¶ 63} Today, the economic-loss rule serves to maintain the distinction between tort law and contract law. Corporex, at ¶ 6. Tort law offers redress for losses suffered by reason of a breach of some duty imposed by law to protect the broad interests of social policy.Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp.Assn. (1990), *Page 23 54 Ohio St.3d 1, 7. In contrast, contract law is designed to compensate a party for breach of duties assumed only by agreement. Id. Generally, tort law protects people and property from injury, while contract law protects the parties' bargained-for expectations. Id. Thus, when a plaintiff suffers only economic losses, a court must determine the source of the duty that forms the basis of the action.Corporex, at ¶ 10. As the Supreme Court of Ohio succinctly stated:
 When a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract.
Id.
 {¶ 64} In the case at bar, Morgan sought to recover his economic losses through tort claims. He did not allege the existence of a contract, and he did not assert a claim for breach of contract. Nevertheless, the trial court analyzed Morgan's case as a breach of contract case in its findings of fact. First, the trial court found that the May 9, 2000 document constituted a contract obligating Mikhail to deliver $27,500 in stock to Morgan within a reasonable time. The trial court characterized Morgan's transfer of an additional $10,000 to Mikhail as a modification of the original contract. Finally, the trial court determined that Morgan's demand for the return of his money was a unilateral rescission, i.e., breach, of the contract.
 {¶ 65} Relying upon the trial court's analysis, Mikhail now argues that Morgan could only recover his losses via a claim for a breach of the May 9, 2000 "contract." Because Morgan did not assert such a claim, Mikhail contends that the economic-loss rule bars any recovery. We find Mikhail's argument unavailing because it depends upon *Page 24 
the trial court's erroneous application of a contractual framework to this case. Contrary to the trial court's ruling, the May 9, 2000 document does not constitute a contract.
 {¶ 66} First, the May 9, 2000 document does not qualify as a promissory note. As a matter of law, a promissory note is considered a contract. Gray Printing Co. v. Blushing Brides, LLC, Franklin App. No. 05AP-646, 2006-Ohio-1656, at ¶ 30; Bertrand v. Lax, Portage App. No. 2004-P-0035, 2005-Ohio-3261, at ¶ 19. A promissory note is defined as "a written promise to pay a certain sum of money at a future time, unconditionally." Burke v. State (1922), 104 Ohio St. 220, 222. The May 9, 2000 document does not promise a payment of money, but rather a "payment" of stock. Consequently, it does not meet the definition of "promissory note."
 {¶ 67} Second, the May 9, 2000 document does not possess all the elements necessary for the formation of a contract. Generally, a contract must include an offer, acceptance, contractual capacity, consideration, a manifestation of mutual assent, and legality of object and of consideration. Minister Farmers Coop. Exchange Co., Inc. v.Meyer, 117 Ohio St.3d 459, 2008-Ohio-1259, at ¶ 28. Additionally, a meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract. Id. "In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange." Miller v. Lindsay-Green, Inc., Franklin App. No. 04AP-848, 2005-Ohio-6366, at ¶ 63. See, also, Zelina v.Hillyer, 165 Ohio App.3d 255, 2005-Ohio-5803, at ¶ 12 (holding that a meeting of the minds occurred if "`a reasonable person would find that the parties manifested a present intention to be bound to an agreement'"). The parties must have a distinct and common intention that is *Page 25 
communicated by each party to the other. McCarthy, Lebit, Crystal Haiman Co., L.P.A. v. First Union Mgt, Inc. (1993), 87 Ohio App.3d 613,620.
 {¶ 68} In the case at bar, Morgan testified that he received the May 9, 2000 document in response to his request for a receipt. The trial court credited this testimony, finding that Morgan believed that the May 9, 2000 document was a receipt for two checks he had given Mikhail. Given this finding, the May 9, 2000 document does not constitute a contract. Because Morgan merely saw the May 9, 2000 document as an acknowledgement of the receipt of his money, he could not possess the intent to contract or the ability to assent to the terms of the contract. According to the evidence introduced at trial, the parties never discussed Morgan extending a loan to Mikhail. Rather, Morgan believed Mikhail was acting as his investment advisor, and he entrusted his money to Mikhail so that Mikhail could invest it in accordance with the investment plan. Morgan gave Mikhail the $25,000 check to fund his investment portfolio, not to initiate a loan. He accepted the May 9, 2000 document as a receipt, not a contract. Because there was no meeting of the minds, the May 9, 2000 document does not reflect an agreement of any kind.
 {¶ 69} As we stated above, Mikhail argues that, in actuality, Morgan's suit arises from an alleged breach of the May 9, 2000 "contract." Mikhail contends that Morgan's failure to assert a claim for breach of that "contract" bars any recovery for his losses. Because the May 9, 2000 document is not a contract, Mikhail's argument fails. Without the existence of a contract, the economic-loss rule is irrelevant. As Mikhail did not owe Morgan a contractual duty, an action in tort is Morgan's sole avenue for recovery. The Supreme Court of Ohio intended courts to apply the economic-loss rule to maintain the line between contract and tort, not to completely preclude recovery of all economic losses *Page 26 
through an action in tort. Here, where a plaintiff has no breach of contract action to assert, he may pursue his remedy via applicable tort claims. Accordingly, we overrule Mikhail's first assignment of error.
 {¶ 70} By Mikhail's second assignment of error, he argues that the trial court erred in concluding that he defrauded Morgan. We disagree.
 {¶ 71} In reviewing the trial court's judgment finding Mikhail liable for fraud, we are guided by the principle that judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, syllabus. Further, we must presume the findings of the trial court are correct because it is best able to observe the witnesses and use those observations in weighing the credibility of the proffered testimony. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 81. If the evidence is susceptible to more than one interpretation, we must construe it consistent with the trial court's judgment. Central MotorsCorp. v. Pepper Pike (1995), 73 Ohio St.3d. 581, 584.
 {¶ 72} To prove fraud, a plaintiff must demonstrate: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation; and (6) a resulting injury proximately caused by the reliance.Williams v. Aetna Fin. Co. (1998), 83 Ohio St.3d 464, 475; Gaines v.Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54, 55. In the case at bar, Mikhail concedes that *Page 27 
Morgan proved the first four elements of fraud. However, he asserts that Morgan did not establish either justifiable reliance or an injury proximately caused by reliance.
 {¶ 73} First, Mikhail contends that, pursuant to the parol evidence rule, Morgan could not rely upon oral promises that the May 9, 2000 "contract" contradicted. Mikhail cites Natl. City Bank v. FacilitiesAsset Mgt, Inc. (2001), 145 Ohio App.3d 340, 345, for the proposition that, "[i]t is well established that Ohio law does not allow a party to prove fraud by claiming that the inducement to enter into an agreement was a promise which is squarely contradicted by the written terms of that agreement." Although Mikhail relies upon a valid rule of law, it is not applicable here. As we held above, the May 9, 2000 document is not a contract, so the parol evidence rule is irrelevant.
 {¶ 74} Next, Mikhail argues that Morgan cannot prove justifiable reliance upon his representations when Morgan failed to investigate him or his claims. We find this argument equally unavailing. In determining whether a plaintiff is justified in relying upon the defendant's representations, a fact finder must not revert to a "reasonable person" standard. Three-C Body Shops, Inc. v. Welsh Ohio, LLC, Franklin App. No. 02AP-523, 2003-Ohio-756, at ¶ 21. Rather, the inquiry focuses upon the circumstances of the case and the relationship between the parties. Id.;Mussivand v. David (1989), 45 Ohio St.3d 314, 322. Reliance is justified if, under the circumstances, the plaintiff did not have reason to doubt the veracity of the representation. Brothers v. Morrone-O'Keefe Dev.Co., Franklin App. No. 03AP-119, 2003-Ohio-7036, at ¶ 36; Three-C BodyShops, Inc., at ¶ 21.
 {¶ 75} In the case at bar, Mikhail and Morgan were acquaintances from college, and Morgan knew that Mikhail's father was a respected Ohio University finance professor. *Page 28 
Based upon these circumstances, Morgan was predisposed to trust Mikhail. Also, Morgan questioned Mikhail about his own portfolio, and Morgan asked whether Mikhail was a licensed stockbroker. After the incident at Scottsdale, Morgan sought an explanation from Mikhail for the manager's refusal to deal with him. The positive answers to all Morgan's questions alleviated his concerns.
 {¶ 76} Given these facts, we find that the manifest weight of the evidence supports the trial court's finding that Morgan justifiably relied upon Mikhail's representations. Although Morgan did not conduct an independent investigation of Mikhail, Morgan trusted Mikhail based upon their relationship and Mikhail's connections and representations. Ultimately, Morgan discovered that he had misplaced his trust, but with no reason to doubt Mikhail, Morgan had no obligation to conduct an investigation.
 {¶ 77} Finally, Mikhail argues that Morgan was the proximate cause of his own losses because he blocked Mikhail's efforts to transfer stock to him. We disagree. The evidence establishes that Morgan sustained monetary loss when he gave Mikhail money in reliance upon Mikhail's representations that he would invest that money on Morgan's behalf in accordance with the investment plan. Thus, reliance upon Mikhail's fraudulent misrepresentations proximately caused Morgan's injury. Morgan's injury occurred — and Mikhail committed fraud — when Mikhail took possession of Morgan's money. Mikhail's later unsuccessful attempts to mitigate Morgan's losses by transferring stock into his name does not shift the cause of Morgan's injury. Therefore, we conclude that the manifest weight of the evidence supports the trial court's finding that Morgan's justifiable reliance proximately caused his injury. *Page 29 
 {¶ 78} Based upon the foregoing, we conclude that competent, credible evidence establishes the last two elements of Morgan's fraud claim. Accordingly, we overrule Mikhail's second assignment of error.
 {¶ 79} By Mikhail's third and fourth assignments of error, he argues that the trial court erred in finding in Morgan's favor on his breach of fiduciary duty and conversion claims. As we have found the trial court properly decided Morgan's fraud claim, Mikhail remains liable to Morgan whether or not the trial court erred in its resolution of the breach of fiduciary duty and/or conversion claims. Accordingly, we find that Mikhail's third and fourth assignments of error are moot.
 {¶ 80} By Mikhail's fifth assignment of error, he argues that the trial court erred in adopting the judgment entry he proposed as setting forth the parties' resolution of Morgan's contempt motion. Mikhail asserts that by the time the court adopted the judgment entry, it was impossible for him to timely perform the actions required. We sustain this assignment of error, but only for the reasons set forth in our discussion of Morgan's ninth assignment of error.
 {¶ 81} By Mikhail's sixth assignment of error, he argues that the trial court erred in finding that he misrepresented his occupation on the Scottsdale form. Beyond the fact that Mikhail is not a licensed investment advisor, the record contains no evidence regarding Mikhail's occupation. Thus, the trial court had no evidentiary basis on which to conclude that Mikhail was not an economist. However, that error did not materially prejudice Mikhail because it did not contribute to a finding of liability against him. That alleged misrepresentation did not form the basis of the trial court's finding of fraud *Page 30 
because Morgan never saw it, and consequently, could not have relied upon it. Accordingly, we overrule Mikhail's sixth assignment of error.
 {¶ 82} For the foregoing reasons, we sustain Morgan's fifth and ninth assignments of error, and we overrule his first, second, third, fourth, sixth, seventh, and eighth assignments of error. Additionally, we sustain Mikhail's fifth assignment of error to the extent stated above, we overrule his first, second, and sixth assignments of error, and we find his third and fourth assignments of error moot. Based on our rulings on the parties' assignments of error, we reverse the judgment of the Franklin County Court of Common Pleas that purported to reflect the parties' resolution of Morgan's contempt motion. Moreover, we reverse in part and affirm in part the judgment of the Franklin County Court of Common Pleas that found Mikhail liable and awarded damages. We remand this case to that court so that it may: (1) hold an evidentiary hearing to determine which party accurately represented the terms of the parties' resolution of Morgan's contempt motion, and (2) recalculate the amount of damages due to Morgan based upon the evidence adduced at trial.
Judgments affirmed in part and reversed in part; and cause remandedwith instructions.
BROWN and KLINE, JJ., concur.
KLINE, J., of the Fourth Appellate District, sitting by assignment in the Tenth Appellate District.
[1] Morgan voluntarily dismissed J.B. Oxford after it complied with the temporary restraining order.
[2] Mikhail eventually provided the records, although he failed to meet the court-imposed deadline.
[3] Despite Morgan's contention, the permanent injunction does not include such a mandate. However, as we stated above, the temporary restraining order required Mikhail to submit to the clerk funds sufficient to make up the difference between Morgan's loss ($37,923) and the amount recovered from the J.B. Oxford account ($6,628.44).
[4] The last pleading in the record is Mikhail's answer to Morgan's amended complaint, filed October 29, 2003. *Page 1